**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

ANTHONY JON CHAN-VANCE,

              Defendant.

Case No. 20-cr-86-CJW

**REPORT AND RECOMMENDATION
ON DEFENDANT'S AMENDED
MOTION TO SUPPRESS AND
DISMISS**

---

**TABLE OF CONTENTS**

                                                          **Page**

*I.      INTRODUCTION*..................................................................2

*II.     FINDINGS OF FACT*..........................................................4

     *A.     M.M. Provides Information Leading to the Arrest of A.M.*................4

     *B.     Obtaining the Warrant*............................................................7

     *C.     The Search*............................................................................8

     *D.     The Interview with Defendant*..................................................9

*III.    DISCUSSION*..................................................................10

     *A.     The Parties' Arguments*..........................................................10

     *B.     Whether the Warrant Provided Probable Cause for the Search of Defendant's Residence*..........................................................12

          *1.     The Reliability of M.M.'s Information*..............................14

1

>    2.    *Nexus Between the Contraband and the Place Searched* ..........**18**

>    3.    *Recommendation* ........................................................**18**

>    C.   *Whether the* **Leon** *Good Faith Exception Applies to the Warrant* ........**18**

>    D.   *Defendant's Statements* ...............................................**23**

>    E.   *Defendant's Fifth Amendment Claim* .................................**31**

>    1.    *Whether Defendant's Recorded Statements Should be Suppressed* .........................................................**31**

>    2.    *Whether Defendant's Statements Prior to the Recorded Interview Require Suppression of any Evidence* ...............................**33**

>    F.   *Defendant's Argument that 18 U.S.C. Section 922(g)(3) is Unconstitutionally Vague* .................................................**36**

**IV.   CONCLUSION** .................................................................**38**

## I.    INTRODUCTION

On October 14, 2020, the Grand Jury charged Defendant with one count of Possession of a Firearm by a Drug User in violation of 18 United States Code 922(g)(3). (Doc. 2.)  The matter before the Court is Defendant's Amended Motion to Suppress and Dismiss.  (Doc. 17.)  Defendant seeks suppression of evidence seized during the May 20, 2019 search of his residence and all statements he made during the search. (*Id.*) Defendant filed an inventory of the items he seeks to suppress. (Doc. 18.)  Defendant also contends that 18 United States Code Sections 922(g)(3) and 924(a)(2) are unconstitutionally vague as applied to him and thus, the charge against him should be dismissed.  The Government filed a timely resistance to the motions.  (Doc. 24.)  The

Case 1:20-cr-00086-CJW-MAR     Document 30     Filed 02/03/21     Page 2 of 38

Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.

I held a hearing on December 3, 2020. I granted Defendant's motion to appear by telephone or videoconference. (Docs. 26, 27.) At the hearing, I determined that Defendant was present in the office of his attorney, Steven DeVolder. (Doc. 28 at 1.) I determined that Defendant voluntarily waived his right to appear in the courtroom in person for the hearing. (Trans. Dec. 3, 2020 Hr'g.)[1]

At the hearing, the Government's Exhibits 1 through 4 were admitted without objection:

1. The search warrant application at issue in the case;
2. The return of the search warrant;
3. Seven photographs related to the search; and
4. A video of an interview of Defendant at the time of the search. (Doc. 28 at 2.)

The Government called two witnesses, Sergeant Christopher Ward and Investigator Jeffrey Gilson, both employed by the City of Marion, Iowa Police Department. I found both witnesses credible.

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress and **hold in abeyance** his Motion to Dismiss.

---

[1] Citations to the hearing transcript and to hearing testimony are to the Court Reporter's rough draft of the transcript of the December 3, 2020 suppression hearing that was provided as a courtesy to the Court. An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

3

## II.   FINDINGS OF FACT

### A.   M.M. Provides Information Leading to the Arrest of A.M.

Sergeant Ward, who authored the search warrant application at issue, was principally responsible for the investigation and execution of the warrant. At the time of the hearing, Sergeant Ward was assigned to the patrol division.  However, at the time of the search of Defendant's residence, he was an investigator; that is, he undertook investigations of offenses that took longer than a single shift to complete. Attachment A to the Application for Search Warrant ("the attachment") lists Sergeant Ward's qualifications, including that he is a sworn police officer, he has been trained in narcotics and other criminal investigations, and he has been assigned to the Drug Enforcement Agency's Drug Task Force. (Gov. Ex. 1 at 4.)  Sergeant Ward has authored between 50 and 100 search warrants for the Marion Police Department ("MPD") or as a task force officer with the Drug Enforcement Agency.  (Ward Hr'g Test.)  The attachment states, among other things, that at the time of the warrant application, Sergeant Ward had been a police officer for twelve years, with four years in the investigations division.  (Gov. Ex. 1 at 4.)   The attachment also includes reference to his experience and training concerning drug-related crimes.  (*Id.*)

Unless otherwise noted, Sergeant Ward testified to the following facts.  On the weekend of May 12, 2019, Sergeant Ward was called out to interview M.M.  M.M. had previously spoken with other police officers about her husband, A.M.  M.M. and A.M. were going through a divorce.

Prior to Sergeant Ward's involvement, M.M. told an MPD patrol officer that A.M. was driving into Marion without a valid driver's license and that he possessed narcotics, possibly in his vehicle.  Law enforcement somehow identified the vehicle A.M. was driving and traced it to its owner, T.M.  T.M. and A.M. are siblings.  T.M.'s listed

4

address is 1240 First Avenue, Marion, Iowa ("the First Avenue residence"), where the search at issue occurred. T.M. was Defendant's fiancé.

A patrol officer located A.M. and made contact with him at a convenience store.[2] A.M. told the officer he had marijuana in the center console of his vehicle. An open-air sniff of the vehicle was performed by another officer's canine partner who "alerted," presumably to the presence of illegal drugs. A subsequent search located multiple containers with marijuana, THC, an Alprazolam tablet, and drug paraphernalia in the vehicle. A.M. was arrested for possession of the drugs and transported to the Linn County Correctional Center. Keys to the vehicle he had been driving were delivered to the First Avenue residence.

The affidavit states that Officer J. Gallagher relayed to Sergeant Ward information about statements made by M.M. on May 12, 2019, including that A.M. had been selling methamphetamine to patients at a Cedar Rapids methadone clinic,[3] that he kept narcotics at his sister's residence (the First Avenue residence), and that drugs were hidden in the drop ceiling of the residence. (*Id.* at 8-9.) The affidavit also notes that Officer T. Peterson spoke with M.M., that she told him A.M. sold marijuana, and that she had found several bags of marijuana at their residence at 1315 22nd Avenue SW, Cedar Rapids, Iowa. (*Id.* at 9.) She also informed Officer Peterson that she had been at the

---

[2] At times, the Government and Sergeant Ward referred to this as a "traffic stop." Sergeant Ward ultimately clarified that A.M.'s vehicle was parked at a convenience store and A.M. was observed standing in line inside. Thus, A.M. was not pulled over while driving his vehicle. The distinction makes no difference to my report or recommendations.

[3] The affidavit states, "Officer Gallagher advised [M.M.] had information that [A.M.] was selling methamphetamine to patients . . ." (Gov. Ex. 1 at 8.) Defendant's gloss on this statement is that Officer Gallagher gave M.M. information about A.M. (Doc. 17-2 at 2.) This interpretation makes little sense in the context of the affidavit. I believe a correct interpretation of the statement is that "Officer Gallagher advised [the affiant that] [M.M.] had information that [A.M.] was selling methamphetamine to patients." As written, the sentence is not a model of clarity. However, my interpretation makes grammatical sense, but Defendant's gloss does not. Moreover, as Defendant repeatedly points out, M.M. is the source of information about A.M.

First Avenue residence on May 9, 2019 and had seen a large freezer bag containing marijuana in an igloo cooler. (*Id.*)

Sergeant Ward then interviewed M.M. at her residence. His affidavit provides the following relevant details of that interview:

- M.M. and A.M. are in the process of divorce.
- M.M. claimed that A.M. told her "everything."
- A.M. is "staying and living" with his sister T.M. and Defendant at the First Avenue residence.
- A.M. and Defendant store marijuana and methamphetamine ICE at the First Avenue residence.
- M.M. recalled seeing a large igloo cooler on May 9, 2019 at the First Avenue Residence with a freezer bag full of marijuana.[4]
- She reported that Defendant always carries a small handgun because he had upset people "in the drug trade world."
- She had been told that Defendant and A.M. store narcotics in the drop ceiling of the basement laundry room.

It is also noteworthy that M.M. provided law enforcement a small amount of marijuana and some drug paraphernalia she had found while cleaning out A.M.'s remaining belongings at her Cedar Rapids residence. (*Id.*)

During the interview, M.M. received a telephone call from A.M. from the Linn County Jail. A.M. reported that he knew police were at the Cedar Rapids residence because his sister, T.M., could see police vehicles from "up the street." (*Id.*) It was not explained why T.M., who resides in Marion, was near the Cedar Rapids residence. The

---

[4] The affidavit contains an estimated weight of the marijuana of two pounds. It is not clear whether the estimate was made by M.M. or Sergeant Ward.

affidavit reports that "[M.M.] and [A.M.] then began to argue about A.M. selling and using narcotics." (*Id.*)

**B.    *Obtaining the Warrant***

Sergeant Ward prepared and obtained a search warrant for the First Avenue residence where he believed Defendant, A.M., and T.M. resided.  Sergeant Ward testified regarding the process that resulted in the issuance of a search warrant by Iowa Sixth Judicial District Associate Judge Angeline Johnston on May 13, 2019.[5]  Judge Johnston has been a judge for thirteen years.

Sergeant Ward testified that he prepared the application for the search warrant contained in Government Exhibit 1.  While the application is largely self-explanatory, it does bear some discussion.  The application first describes the places to be searched: a single-family dwelling; electronic digital evidence; and the urine of T.M., A.M., and Defendant. (Gov. Ex. 1 at 13.)  It describes more particularly the evidence or contraband being sought, including but not limited to controlled substances, drug paraphernalia locked containers were such items may be secreted, drug manufacturing items weapons, money, and the aforementioned urine.  (*Id.* at 14.)

In addition to the description of Sergeant Ward's training, the attachment also contains a description of what he believes about drug users based on his experience with drug users or traffickers and the records they keep and how they keep them, photographs they take and store, drug paraphernalia they maintain, their use and possession of firearms, currency and other means of exchange, electronic devices used by them, how they use vehicles, and that bodily fluids may contain evidence of drug use.  (*Id.* at 3-4.)

Sergeant Ward testified that Judge Johnston crossed out and initialed Attachment B relating to confidential informants because no confidential informant was being used.

---

[5] During the hearing, Judge Johnston was occasionally referred to incorrectly as "Judge Johnson."

Sergeant Ward also testified that there is a requirement that an affiant confer with a Linn County attorney about a warrant application for warrants that are "done during daytime hours." Presumably, this refers to warrants that are applied for during the daytime and not to warrants that are sought at night because of some emergency. Sergeant Ward also testified that Linn County Attorneys do not always sign warrants. In this case, it is not clear whether a Linn County Attorney did, in fact, confer with Sergeant Ward or why the warrant application was not signed by a Linn County Attorney.

## C.    *The Search*

Sergeant Ward testified that the search of the First Avenue residence commenced on May 20, 2020 at about 7:00 a.m. Sergeant Ward and Investigator Gilson appeared to have been principally responsible for conducting the search and associated interviews as detailed below. They were accompanied at the outset of the search by the MPD SWAT Team. When the officers arrived, they encountered T.M. and a man named L. whose last name Sergeant Ward could not recall. Defendant was inside but came out as officers were speaking with T.M. and L. Inside the residence were five children related to Defendant. Arrangements were made for the children to be picked up and taken elsewhere before the search commenced.

Exhibit 2 is an inventory[6] of items seized from Defendant's residence during the search. The northwest bedroom where items A-1 through A-7 were seized appeared to have been occupied by Defendant and his fiancée T.M. (Ward Hr'g Test.) The Ruger handgun referred to in the indictment was in the closet of the northwest bedroom. (Gov. Ex. 2 at 2; Gov. Ex. 3 at 4, 5.) Sergeant Ward testified that multiple items consistent

---

[6] MPD procedure calls for assignment of a letter to each room that is searched. Thus, on Exhibit 2, items A-1 through A-7 were seized from the northwest bedroom, items C-1 through C-3 were seized from the kitchen, and D-1 through D-3 were seized from the downstairs south bedroom. Items T-1 and T-2 were urine samples from Defendant and T.M. respectively. Items F-1 and F-2 were seized from Defendant's person.

with marijuana use and marijuana itself, as well as forms of THC, were located in the northwest bedroom. (Gov. Ex. 2 at 2.)

A.M. appeared to be using the downstairs south bedroom. (Ward Hr'g Test.) A yellow igloo cooler consistent with the description provided by M.M. was found in the bedroom occupied by her husband. (Gov. Ex. 2 at 2; Gov. Ex. 3 at 2, 3, 6, 7.) While no drugs were recovered from inside the cooler, "vape cartridges" were located on or near the cooler. (Gov. Ex. 2 at 2; Ward Hr'g Test.) Because M.M. had told law enforcement that drugs were stored in a ceiling, the investigators attempted to locate contraband in such places but did not find any. (Ward Hr'g Test.)

## D.    *The Interview with Defendant*

After the children had been removed from the First Avenue residence, officers interviewed Defendant, T.M., and L. Defendant seeks to suppress the statements he made in a video-recorded interview conducted by Sergeant Ward in a bedroom of the First Avenue residence. Sergeant Ward was familiar with Defendant from a prior federal criminal investigation in which Defendant was a witness who testified before the grand jury. Sergeant Ward characterized Defendant as always having been "completely respectful of myself and other officers when I've been around." (Ward Hr'g Test.)

Sergeant Ward testified that Defendant was given a *Miranda* warning at the commencement of the recorded interview. It appears Defendant made some statements to law enforcement about marijuana use prior to the recorded interview and, apparently, he was discovered to have possessed marijuana. The video commences with Defendant being ushered, in handcuffs, into a bedroom. (Gov. Ex. 4 at 00:09.) Immediately after providing the *Miranda* warning and Defendant waiving his right to remain silent and agreeing to speak to officers, Sergeant Ward stated, "Obviously you have some marijuana. I know that you said out there, that's kind of your drug of choice." (*Id.* at 1:14.) It also appears from the ensuing conversation that law enforcement had already

found marijuana on Defendant's person and in a bag.  (*Id.* at 3:49-4:00.)  Defendant first denied that the search would disclose a gun, but later admitted they would find his Ruger handgun in the closet. (*Id.* at 4:10, 10:19).

Sergeant Ward characterized their discussion on the day of the search as casual and described Defendant as "lighthearted" and "good-natured."  (Ward Hr'g Test.) Investigator Gilson described Defendant's tone as "friendly and at times joking." (Gilson Hr'g Test.) Having reviewed the video, I agree with this assessment. Sergeant Ward and Investigator Gilson conducted the post-*Miranda* interview of Defendant away from other occupants of the residence.  The video of the interview shows Defendant was seated on some piece of furniture.  (Gov. Ex. 4.)  Investigator Gilson was standing and Sergeant Ward was seated on the floor.  Sergeant Ward testified that Defendant was not free to leave until after the search had been completed.

## III.    DISCUSSION

### A.    The Parties' Arguments

Defendant first asserts that the warrant was not supported by probable cause.  He argues that the warrant application is inadequate, especially as it relates to the narrative supplied by Sergeant Ward on pages 7 through 9 of the affidavit.  Defendant first takes issue with the extent to which the affidavit relies on information provided by M.M. Defendant objects that M.M. was not herself the affiant.   Defendant implies that information supplied by an estranged wife is inherently unreliable.  Defendant argues that because of the pending divorce she "had reason to put the blame for the presence of [the drugs at her house] (as well as the drugs found in the couple's car)[7] on her husband." (Doc. 17-2 at 3.)

---

[7] The drugs were found in a car registered to A.M.'s sister.  Thus, it was not the couple's car.

After describing the information from M.M. as "thin gruel," Defendant criticizes the warrant application for what it did not include, such as evidence of controlled purchases at the First Avenue residence, testimony from an affiant[8] with personal knowledge regarding the presence of drugs, any credibility finding regarding M.M. by the judge who signed it, evidence regarding people coming and going from the residence that might indicate drug transactions, or statements from A.M.  (*Id.* at 3-4.)  Defendant also argues that Sergeant Ward did not sign the affidavit and, therefore, it is unsworn.[9] (*Id.* at 6.)  Defendant argues that the information contained in the warrant application is not tied to the possible presence of contraband at the First Avenue residence.  (*Id.* at 3.) Defendant refers to the information supplied by M.M. as speculative regarding the possible presence of contraband at the First Avenue residence.  This, he contends, is underscored by law enforcement's alleged failure to discover a cooler[10] or a drop ceiling. (*Id.* at 7.)

Defendant argues that the statements he made at the First Avenue residence should be suppressed. Defendant asserts that he was unlawfully seized pursuant to the unlawful search and, therefore, his statements should be suppressed under the Fourth Amendment. He also contends the statements were involuntary and should be suppressed under the Fifth Amendment.

---

[8] Defendant's brief (and his counsel's oral argument) repeatedly refers to the "singular affidavit." (*See, e.g.*, Doc 17-2 at 6.) I take it Defendant is emphasizing there was only one affidavit, rather than suggesting that the affidavit is exceptional or peculiar as "singular" sometimes connotes. In any event, Defendant has not cited any authority requiring more than a single affidavit and, other than criticizing it for not supporting probable cause, he points to nothing so peculiar about it that would make it invalid.

[9] This argument can be disposed of easily. A signature appears at the conclusion of the affidavit by "Affiant." (Gov. Ex. 1 at 3.)  Judge Johnston signed immediately below confirming it was "subscribed and sworn before me." (*Id.*)  At the hearing, Sergeant Ward confirmed he signed as the affiant.  (Ward Hr'g Test.)

[10] In fact, a cooler matching the description was located at the residence, as described above.

For his motion to dismiss, Defendant contends the statutory sections under which he was charged—18 U.S.C. Section 922(g)(3) and 924(a)(2)—are unconstitutionally vague as applied to him and thus, the charge against him should be dismissed.

The Government resists the motion to suppress, arguing that the warrant is supported by probable cause. Even if probable cause is wanting, the Government contends the *Leon* good faith exception applies. The Government relies on M.M.'s confirmed report that her husband was traveling in the possession of drugs as evidence of her reliability and corroboration of the information she supplied. The Government also points to the drugs recovered from the residence of M.M. and M.M.'s telephone conversation with A.M. about his drug use and sales as confirming her reports.

The Government argues that even if the warrant lacks probable cause, the *Leon* good faith exception applies. The Government contends that because the search warrant was valid, Defendant was not seized in violation of the Fourth Amendment and, therefore, Defendant's statements are not the fruit of the poisonous tree. The Government asserts the video shows the interview to have been voluntary. Finally, the Government contends Defendant's void-for-vagueness challenge is premature.

**B.      *Whether the Warrant Provided Probable Cause for the Search of Defendant's Residence***

The Fourth Amendment to the United States Constitution provides that "no [search] Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)). "Common-sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even

usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "Reviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 236, 238-39). A substantial basis only requires that the issuing judge make a practical and common-sense determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability" that evidence of a crime will be found at the location. *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986).

"[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citing *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir.1993)). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (citations omitted). "Although 'an informant's veracity, reliability and basis of knowledge are all highly relevant' in determining whether probable cause exists when an affidavit is based on hearsay information, they are not 'entirely separate and independent requirements to be rigidly exacted in every case.'" *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (quoting *Gates,* 462 U.S. at 238; citing *United States v. McAtee,* 481 F.3d 1099, 1102 (8th Cir. 2007)). Generally, "the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Carter*, 729 F.2d 935, 940 (8th Cir. 1984).

Defendant's arguments regarding the sufficiency of the probable cause to support the warrant involve the motive of M.M., the reporting party; the alleged speculative

nature of the information provided; and the nexus between that information and the place to be searched.

To review, Sergeant Ward's affidavit reported, *inter alia*, that M.M. and A.M. were in the process of divorce; that, according to M.M., A.M. told her "everything;" and that A.M. was "staying and living" with his sister T.M. and Defendant at the First Avenue residence. She also told law enforcement that A.M. and Defendant stored marijuana and methamphetamine ICE at the First Avenue residence. She specifically recalled seeing a large igloo cooler on May 9, 2019 at the First Avenue residence with a freezer bag full of marijuana. She further reported that Defendant always carries a small handgun because he had upset people "in the drug trade world." She had been told that Defendant and A.M. store narcotics in the drop ceiling of the basement laundry room. (Gov. Ex. 1 at 9.) As mentioned above, M.M. also provided law enforcement a small amount of marijuana and some drug paraphernalia she had found while cleaning out A.M.'s remaining belongings at her Cedar Rapids residence. (*Id.*)

In addition, law enforcement overheard M.M. receive a telephone call from A.M. from the Linn County Jail. A.M. reported that he knew police were at M.M.'s residence because his sister, T.M., could see police vehicles from "up the street." It was not explained why T.M. was near the residence. The affidavit reports that "[M.M.] and [A.M.] then began to argue about [A.M.] selling and using narcotics." (*Id.*) T.M. was Defendant's fiancée.

### 1. The Reliability of M.M.'s Information

Defendant's implicit argument that the information supplied by an estranged spouse is inherently unreliable has some appeal on the surface. Family law practitioners know only too well the motivation of parties to shade their testimony to present a spouse in a bad light for a tactical advantage or even out of spite. Such a motive, by itself, does not, make the testimony unbelievable. Judges in those cases are nevertheless put to the

14

task of assessing credibility of the witnesses, just as law enforcement and, ultimately, the judge who reviewed the warrant, did in the case at bar.

By providing information to the police about her husband's illegal activity, M.M. may have been seeking a tactical advantage in her divorce proceedings or may have even done so out of spite. There is no evidence to support this conclusion, although Defendant would have the Court conclude M.M.'s report was based on such a motivation. However, even if the report was the product of such a motivation, that does not necessarily make it unreliable. Jailhouse informants, cooperating witnesses, and witnesses who seek monetary rewards all seek something in providing their testimony. *See, e.g.*, *United States v. Coplen,* 533 F.3d 929, 931 (8th Cir. 2008) (cooperating witnesses' motivations do not make their testimony "inherently unreliable"). This motivation is subject to scrutiny by finders of fact. *United States v. Shepard*, 462 F.3d 847, 867 (8th Cir. 2006) (discussing jury credibility findings). Whenever a witness is providing information in a criminal proceeding – whether as a cooperating witness or an aggrieved spouse – presumably the witness is motivated to provide believable information that will allow them to earn whatever incentive they seek. Also, a witness who provides a false report to law enforcement is subject to criminal penalties. Iowa Code § 718.6. Thus, an aggrieved spouse would have incentive to provide truthful, useful information and disincentives to mislead law enforcement. Ultimately, the mere fact that M.M. and A.M. were divorcing is not particularly useful in assessing whether substantial evidence in the record supports the existence of probable cause.

On the other hand, the fact that M.M. was the spouse of A.M. supports the finding of probable cause. M.M. reported that her husband told her "everything." No doubt "everything" is hyperbolic. A less literal but reasonable interpretation of "everything" is that A.M. shared much information with M.M. This interpretation is somewhat corroborated by the fact that he called to visit with her knowing the police were present.

It is reasonable to believe that A.M.'s spouse, with whom he had recently been living, would be in a position to credibly report on his drug use and drug dealing. Indeed, she reported on his drug dealing history, providing specifics about his sales to patients at a methadone clinic. Similarly, she was able to report that Defendant was known to carry a gun because of having upset people in the drug trade. Thus, this information was specific and appeared to describe conduct that occurred over some time, rather than an isolated instance of having encountered some drug-related evidence. Thus, this information was credible and could be reasonably relied upon.

The determination that there was probable cause is supported by the corroboration of M.M.'s statements. Prior to the warrant application, M.M. provided information that A.M. was traveling in a vehicle that contained drugs. That information was shown to be accurate when A.M. was found traveling in a vehicle that contained drugs. The information she supplied was also corroborated in other ways. The corroboration of even innocent minor details contributes to the finding of probable cause. *See Stevens*, 530 F.3d at 719. First, M.M. provided law enforcement marijuana and paraphernalia that she said belonged to A.M. While Defendant attempts to cast doubt on her claim these items belonged to A.M., under the totality of the circumstances, the issuing judge could reasonably conclude A.M. possessed the items consistent with his reported use, dealing, and possession of other drugs.

Second, I find that the telephone conversation between M.M. and A.M. regarding A.M.'s drug use and dealing is also somewhat supportive of the determination of probable cause. The affidavit does not attempt to overstate the significance of this conversation. A.M. knew the police were at the Southwest Cedar Rapids residence because T.M., who resides in Marion, was inexplicably up the street and somehow timely provided the information to her incarcerated brother. Knowing the police were present, A.M. nevertheless initiated a telephone call to his wife and told her that he knew the police

16

were present and how he knew it. It is not entirely clear whether Sergeant Ward was able to hear both sides of the conversation. However, it appears he was able to determine something about the substance of the discussion. The affidavit describes the substance of the conversation as follows: "[M.M.] and [A.M.] then began to argue about [A.M.] selling and using narcotics." (Gov. Ex. 1 at 9.) While the affidavit does not contain any details about A.M.'s statements, the circumstances leading to the call, i.e., the arrest on drug charges and the intelligence provided to A.M. by his sister, are consistent with him being concerned with what M.M. might tell law enforcement about his involvement with illegal drugs.

Defendant also referred to the statements that A.M. was keeping the narcotics he was selling at his sister's residence as speculation. These statements were not speculative for several reasons. First and foremost, M.M. reported having seen a large quantity of marijuana at the First Avenue residence as recently as May 9, 2019. She was able to provide specific details regarding how and where the drugs were stored. As A.M.'s spouse she was well-positioned to know, as she reported, about his on-going involvement with drugs. Moreover, A.M. had not moved in with a group of people who were strangers to her. T.M. was M.M.'s sister-in-law and the fiancée of Defendant with whom she had recent contact. Thus, she was well-positioned to report on Defendant's involvement in the "drug trade world," as set forth in the affidavit. Accordingly, her statements—founded on her personal observations at the residence and knowledge of the residents themselves—were not speculative. I also find it persuasive that the information M.M. supplied was specific, even if, in the case of the drop-ceiling, the information proved incorrect. I note that M.M. did not report that she had actually seen drugs stored in a drop ceiling, only that she had been told about drugs located in the ceiling. M.M. did not merely offer an opinion that law enforcement would locate drugs at the residence. She reported a specific time she had witnessed the marijuana and was able to describe the

manner of its storage.  Thus, I find the challenge based on M.M.'s statements should be denied.

### 2.    *Nexus Between the Contraband and the Place Searched*

In addition, there is substantial evidence to support the determination that there was "a nexus between the contraband and the place to be searched." *Tellez*, 217 F.3d at 550.  M.M. knew her estranged husband was residing at the First Avenue residence, she had recently been to that residence, and had seen drugs there. She also knew of her husband's and Defendant's ongoing involvement in the drug trade. Law enforcement independently confirmed that A.M. was in possession of drugs while driving a vehicle registered to his sister at the First Avenue residence.

Looking at the totality of the circumstances detailed in the affidavit, I find that it provided the judge with a "fair probability" that illegal drugs would be found at Defendant's residence.  *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir. 1986) ("Probable cause requires only a 'fair probability,' and not a certainty, that contraband will be found at the premises to be searched, and the affidavit here on its face provided a substantial basis for a conclusion that such a probability existed.") (citation omitted). Thus, the application provided a nexus between the contraband and the place to be searched.  *See Tellez*, 217 F.3d at 550.

### 3.    *Recommendation*

After a thorough review of the evidence and of the parties' arguments, I conclude that Sergeant Ward's affidavit provided a substantial basis for the judge's conclusion that probable cause existed to issue a warrant to search Defendant's residence.  Therefore, I recommend denying this part of Defendant's motion.

### C.    *Whether the* **Leon** *Good Faith Exception Applies to the Warrant*

Although I have recommended the Court find the warrant was supported by probable cause, the District Court may disagree with my conclusion.  Therefore, I will

address whether, as the Government argues, the *Leon* good faith exception applies to the warrant. (Doc. 24-1 at 9-11.) Reviewing courts should not suppress evidence seized pursuant to a search warrant, even if the reviewing court determines probable cause was absent, if the officers applying for the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922 (1984). Under this "good-faith exception," if a law enforcement officer's reliance on a warrant so issued was objectively reasonable, the evidence seized pursuant to the invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).

Defendant's brief does not address *Leon*. Defense counsel addressed the *Leon* argument at the hearing, stating:

> The very officer who gave the affidavit to obtain this warrant obviously knew, and that's Officer Ward, who was intimately associated with the execution of it, obviously knew because it was his affidavit of the thin reed on which this affidavit was based linking the property to the First -- or linking the search to the First Avenue property. That is the two conclusory and more than opaque statements by [M.M.] concerning the activity at the First Avenue property. Realistically and in good faith, he had to have known that that did not support probable cause for the issuance of the warrant. It may be a different call if we had had an officer not involved in obtaining the warrant and executing the warrant, but that's not the case here. The officer who gave the warrant, and executed the warrant, were 1 and the same. It was not some third-party officer that took -- took the actual executing officers by surprise concerning the substantiveness of the information. So even under *Leon*, the officers could not have acted in good faith, because of the knowledge that they had concerning the weakness of the warrant that it did not rise to probable cause.

Part of Defendant's argument can be easily disposed of. "The standard announced in *Leon* is an objective one." *United States v. Gaetna*, No. CR05-1021, 2005 WL 2320062, at *4 (N.D. Iowa Sept. 22, 2005), *aff'd sub nom. United States v. Engler*, 521 F.3d 965 (8th Cir. 2008).

In assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit, and we confine our inquiry 'to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization.

*United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007) (citations omitted; brackets in original.)  Here there is no evidence that Sergeant Ward was aware of other relevant information that he did not include. Thus, the fact that Sergeant Ward both applied for and was involved in execution of the warrant is irrelevant.

*Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate.

(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

485 F.3d at 431 (quoting *Leon*, 468 U.S. at 923; citing *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)) (emphasis in original).  Defendant has not identified any of the *Proell* scenarios he believes is applicable.  Here, Defendant has not accused law enforcement of making false statements to mislead the judge. The gravamen of Defendant's argument is simply that Sergeant Ward should have known the evidence was insufficient to support probable cause: "the local city police jumped the gun here—they should have investigated M.M.'s two speculative statements for confirmation and for additional facts that might have arisen to probable cause. . . ."  (Doc. 17-2 at 8.) Interpreting Defendant's argument charitably, the only exception possibly relevant to this

case is that the warrant is so "facially deficient that no police officer could reasonably presume the warrant to be valid" and it was not objectively unreasonable for law enforcement officers to rely on this warrant, which was issued by a neutral judge. *Proell*, 485 F.3d at 431.

For the reasons set forth above in Part III.B, *supra*, I disagree that probable cause was lacking. Even if I were to accept, *arguendo*, that the warrant was lacking probable cause, it was not "so lacking" that law enforcement officers' reliance on the warrant was "entirely unreasonable." *See United States v. Stankee*, No. CR14-2026, 2014 WL 3735605, at *5 (N.D. Iowa July 28, 2014) (finding that probable cause supported the search warrant, but alternatively finding that the warrant was not so lacking in probable cause that officer's reliance on issuance of the warrant by a judge was unreasonable), *R. & R. adopted*, 2014 WL 4384325 (N.D. Iowa Sept. 3, 2014). Sergeant Ward's affidavit set out many facts from which a reasonable officer could conclude that probable cause existed to conclude there was a fair probability that contraband would be found in Defendant's residence. *See Reed*, 921 F.3d at 757; *Raban v. Butler*, No. CIV.A. 11-5656, 2012 WL 592328, at *2-4 (E.D. Pa. Feb. 22, 2012) (finding that the good-faith reliance exception applied in case of suspected criminal mischief where officer's affidavit provided a circumstantial link between the vandalism and the suspect's residence, provided a motive explaining suspect's involvement, and noted previous alleged behavior on the part of the suspect that was somewhat similar to allegation of criminal mischief).

In determining whether law enforcement's reliance on a warrant was "entirely unreasonable," "[t]he court must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted). *Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge

normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted).

The good-faith exception routinely applies unless there are extreme circumstances which prevent its application. In *United States v. Herron*, for example, the good-faith exception did not apply because although there was no technical legal deficiency in the affidavits, there was "simply" no evidence in the affidavits linking the suspect to criminal activity. 215 F.3d 812, 814 (8th Cir. 2000).

*United States v. Johnson*, 332 F. Supp. 2d 35, 39 (D.D.C. 2004) is a good example of the basis for finding when the good-faith exception does not apply. *Johnson* held the good-faith exception inapplicable where (1) the affiant failed to describe when information was obtained; (2) the affiant failed to corroborate a sponsoring witness's account of events; (3) the affiant failed to obtain a statement from any witness as to suspect's residence; (4) the information giving rise to the search was stale; and (5) nexus to the location to be searched was never established. Sergeant Ward's affidavit fails in none of these particulars.

*United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir. 1988) found the good-faith exception inapplicable where "the affidavit offer[ed] no hint as to why the police wanted to search th[e] residence[,] . . . d[id] not link th[e] location to the defendant and . . . d[id] not offer an explanation of why the police believed they may find incriminating evidence there; the affidavit simply list[ed] the [suspect's] address as a location to be searched." Once again, Sergeant Ward's affidavit cannot be criticized on any of these bases.

*United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005) found the good-faith exception could not apply because the affidavit "completely failed to explain why

[the officer] believed the items sought would be found at [suspect's residence]." Again, Sergeant Ward's affidavit is sufficient in this regard.

Simply put, this is not an extreme scenario in which the good-faith exception is inapplicable. It was not objectively unreasonable for law enforcement officers to believe the facts in the application supported the issuing judge's decision. I note that the testimony established that Judge Johnston is a very experienced judge. The facts presented to her included evidence creating a nexus between Defendant's residence and possession of a large quantity of marijuana only three days prior to the issuance of the warrant. Based on the foregoing, I find that exclusion of the evidence would be inappropriate, even if the District Court concludes the search warrant lacked probable cause, because it was objectively reasonable for officers to rely upon the neutral judge's conclusion that probable cause existed for the warrant. Therefore, I recommend the Court also deny the Defendant's motion on this basis.

**D.**     *Defendant's Statements*

Defendant argues that the statements he made were fruit of the poison tree. Specifically, Defendant states:

> First, suppression as the result of the incriminating statements being obtained as the fruit of the poisonous tree of an invalid Fourth Amendment search (as opposed to a Fifth Amendment right against self-incrimination analysis where *Miranda* rights were given); that is, if the statements were made as the result of a seizure under the Fourth Amendment, such statements— and irrespective of *Miranda*—are subject to exclusion.

(Doc. 17-2 at 8.) Thus, Defendant appears to claim the statements are fruits of the allegedly unlawful search of the residence or of an allegedly unlawful seizure of his person.

I have already concluded there was probable cause for the warrant and, in the alternative, the *Leon* good faith exception is applicable. Because the search does not

constitute a poisonous tree, to the extent the statements are the fruits of the search, they should not be suppressed. The District Court may disagree with me, so I will address whether the statements should be suppressed if the warrant lacked probable cause and the *Leon* good faith exception does not apply.

Any evidence stemming from the search may be excluded as "fruits" if a defendant can prove a "factual nexus between the constitutional violation and the challenged evidence." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011) (quoting *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007)). *Riesselman* stated:

> [O]nce the defendant comes forward with specific evidence demonstrating taint, the government has the ultimate burden of persuasion to show the evidence is not tainted. *Alderman*, 394 U.S. at 183, 89 S. Ct. 961. Evidence showing statements after an illegal search were voluntary is a means of demonstrating the evidence is attenuated from the taint. *See United States v. Vega–Rico*, 417 F.3d 976, 979 (8th Cir. 2005). In order to determine whether statements provided are voluntary to purge the taint of the illegal search, we must consider the giving of *Miranda* warnings, the "temporal proximity" of the illegal search and the statements made, the "presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006).

*Id.* at 1080.

In *Riesselman*, a defendant's Fourth Amendment rights were violated when officers searched his person while conducting a search of his home pursuant to a valid search warrant that did not authorize searches of persons. *Id.* at 1075. The officers found contraband on the defendant's person. *Id.* The defendant was given a *Miranda* warning and said he would speak to officers and made incriminating statements. *Id.* The defendant sought to suppress the statements he made as fruit of the poisonous tree. *Id.* at 1079. The prosecution conceded that the original search of the defendant violated his right to be free from unreasonable searches and seizures. *Id.* The Eighth Circuit affirmed

the district court's holding that the defendant offered "no convincing evidence to show he was influenced by the finding of drugs on his person to make incriminating statements to the officers." *Id.* The court reasoned that the defendant freely spoke with the officer about legal issues beyond the contraband that was found on his person. *Id.* at 1079-80. Based on this evidence, the court held that the defendant "failed the but-for test because he did not provide sufficient evidence to prove a nexus between the illegal search of his person and his statements made to the officers" and affirmed the district court's decision. *Id.* at 1080.

I find that unlike the defendant in *Riesselman*, Defendant has shown that the alleged constitutional violation was the but-for cause of his statements. But-for the execution of the search warrant, Defendant would not have been in a position to speak to law enforcement officers. But-for the presence of officers in Defendant's residence to execute the warrant, they would not have discovered the drugs or the gun that was the subject of their inquiry.

Thus, if the Court concludes the warrant was defective and the *Leon* exception is inapplicable, it should continue to the next stage of the analysis. "The second question is whether the attenuation doctrine applies." *United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017). Evidence is admissible when the connection between the constitutional violation and the evidence is "remote or has been interrupted by some intervening circumstance." *Id.* (citing *Utah v. Strieff*, -- U.S. --, 136 S. Ct. 2056, 2061, (2016)). To show that statements after an illegal search or seizure were voluntary to purge the taint, courts consider (1) whether *Miranda* warnings were given, (2) the "temporal proximity" between the constitutional violation and the statements, (3) intervening circumstances, and (4) the "'purpose and flagrancy of the official misconduct.'" *Riesselman*, 646 F.3d at 1080 (quoting *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006)). *Riesselman* held that even if the district court had erred

in finding no nexus between the Fourth Amendment violation and the defendant's later statements, it would have still affirmed because the government also showed that the statements were sufficiently attenuated from the constitutional violation that they were voluntary. *See id.* at 1081.

A *Miranda* warning was given at the commencement of the interview in the bedroom. The warning was presented clearly and Defendant appeared to understand it. The interview itself was low-key and, if anything, friendly. At one point, the participants even reminisced about prior encounters. I find that Defendant gave a knowing, intelligent, and voluntary waiver of his right to counsel and his right to remain silent. *See id.* at 1080 (citing *Rawlings v. Kentucky*, 448 U.S. 98, 100 (1980), which reasoned that provision of a *Miranda* warning is an "important, although not dispositive" factor). This factor weighs in favor of finding the evidence is attenuated.

When addressing temporal proximity, a short time between the constitutional violation and the statement may be enough to indicate that the statement was voluntary if other circumstances indicate the statement was "sufficiently an act of free will to purge the primary taint." *United States v. Palacios-Suarez*, 149 F.3d 770, 772-73 (8th Cir. 1998) (holding that consent was sufficiently an act of free will to purge the taint of the initial stop where the officer asked the defendant several times if he could search the vehicle nine minutes after the initial stop) (quotation omitted); *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1112 (8th Cir. 2007) (assuming defendant's consent was given only ten minutes after illegal stop does not "compel the conclusion that the consent was insufficient to purge the taint" without analyzing other factors). Here, Defendant's statements were made while the search was on-going. It is unclear how long after law enforcement discovered drugs and Defendant made some statement about them that the recorded interview commenced. Defendant's recorded statements are more akin to those made "immediately on the heels" of a constitutional violation than one purged of taint by

26

passing time. *See United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006), *as amended on reh'g* (Oct. 31, 2006) (quoting *United States v. Duchi*, 906 F.3d 1278, 1285 (8th Cir. 1990)). This factor weighs against finding the evidence is attenuated.

I find that there were no intervening circumstances to remove the taint of the constitutional violation. A change in location can be an intervening circumstance that can make it more probable that statements are the product of free will. *Riesselman,* 645 F. 3d at 1080. Here, the only change in location was within the residence to a room where Defendant was secluded with two officers intimately involved in the search. This change does not weigh in favor of finding the statements are attenuated. *See United States v. Vega-Rico*, 417 F.3d 976, 980 (8th Cir. 2005) (a change of location and having an officer who was not involved in the initial constitutional violation conduct interview sufficiently freed statements from taint of violation)).

*Rawlings v. Kentucky*, 448 U.S. 98 (1980) is instructive. *Rawlings* involved statements obtained during a home search where the occupants were illegally detained. 448 U.S. at 101. *Rawlings* noted the Court had previously rejected a "but-for" approach to the admissibility of statements made by persons illegally detained because, "persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality." *Id.* at 106 (quoting *Brown v. Illinois*, 422 U.S. 590, 603 (1975)). *Rawlings* describes a much less confined detention than in the case at bar. In *Rawlings,* no one appears to have been handcuffed and various detainees moved freely about getting coffee, playing records, and joking about a puppy. *Id.* at 107-08. *Rawlings* held that "these circumstances outweigh the relatively short period of time that elapsed between the initiation of the detention and petitioner's admissions." *Id.* at 108.

In the case at bar, I recommend the Court find the remarkably congenial interaction between Defendant and Sergeant Ward outweighs the absence of a change of location and the absence of lapse of time. Moreover, there is no indication of physical intimidation.

Sergeant Ward sat on the floor during the interview while Defendant sat on some piece of furniture looking down at him. I also find it significant that Sergeant Ward and Defendant shared a cooperative and congenial history, with Defendant having been a witness appearing before a grand jury in a case Sergeant Ward had investigated. They discussed their prior association during the interview. (Gov. Ex. 4 at 5:57, 8:11.) The nature of this prior association helps persuade me Defendant's statements were voluntary and not the product of the alleged illegal seizure. Defendant appears to be willingly sharing information with someone familiar to him, perhaps out of trust or with hope of some benefit from his cooperation. (*Id.* at 3:30.) Nevertheless, I note that not only was Defendant *Mirandized*, he was given additional warnings. (*Id.* at 00:37, 7:15.) For example, Sergeant Ward stated that he was not going to make any promises. (*Id.* at 7:17-7:30, 12:01.)

I have concluded above that there was no official misconduct. As such, I cannot now conclude that the official misconduct was purposeful or flagrant. Thus, this factor weighs in favor of attenuation.

Based on this analysis, I find that although the alleged constitutional violation may have been the but-for cause of Defendant's statements, those statements should be deemed sufficiently attenuated from the alleged violation to avoid their suppression. I recommend denying Defendant's Motion to Suppress as it pertains to the statements Defendant made as fruit of the allegedly unlawful search.

I also recommend denying the motion to suppress Defendant's statements as the product of an allegedly unlawful seizure of his person during the arrest. The Supreme Court has squarely held "that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705-06 (1981). *Summers* held it was constitutionally reasonable to detain a person descending the

front steps while the warrant search was conducted. *Id.* "Later cases have confirmed that this authority to forcibly detain during the warrant search extends to all occupants of the premises, not just the owner or the subject of the warrant." *United States v. Martinez-Cortes*, 566 F.3d 767, 770 (8th Cir. 2009) (citing *L.A. County v. Rettele*, 550 U.S. 609, 613–14 (2007); *Muehler v. Mena*, 544 U.S. 93, 98–99 (2005)). Detaining occupants while a house is being searched "prevent[s] flight in the event that incriminating evidence is found" and facilitates "the orderly completion of the search." *Summers*, 452 U.S. at 702–03; *Martinez-Cortes*, 566 F.3d at 770.

The instant case is similar to *United States v. Johnson*, 528 F.3d 575 (8th Cir. 2008). In *Johnson*, the police obtained a warrant to search an apartment for drugs, money, weapons, and drug paraphernalia and detained the defendant in the following manner:

> Johnson was asleep in the northeast corner bedroom when the police entered. Upon finding him, uniformed officers immediately detained Johnson and restrained his hands in plastic zipper cuffs. The uniformed officers then left, and plain clothes officers came into the apartment. One of the plain clothes officers picked Johnson up off of the bed and put him up against the wall. The officer frisked him, then went into Johnson's pocket, pulling out a package and wallet. In the wallet was over $1,500 in cash; inside the package was 5.33 grams of crack. After Johnson was taken out of the room, the officers found a shoe box containing a loaded Taurus .38 caliber handgun on top of a dresser next to the bed and within reach of any person who was laying on the bed.

*Johnson*, 528 F.3d at 577. *Johnson* further noted:

> *Michigan v. Summers* recognizes that, consistent with *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), a limited intrusion on a person's security is sometimes justified by substantial law enforcement interests such that it may be made on less than probable cause. *Summers*, 452 U.S. at 698–700, 101 S. Ct. 2587. For example, the resident of a home subject to a search warrant may be detained so as to prevent flight, minimize the risk of harm to the officers, and allow the officers to conduct an orderly

29

search. *United States v. Wallace*, 323 F.3d 1109, 1111 (8th Cir. 2003). Because a neutral magistrate has already found probable cause to search the home, there is naturally an articulable and individualized suspicion of criminal activity that justifies the detention of the home's occupants. Summers, 452 U.S. at 703–04, 101 S. Ct. 2587. In contrast, an articulable and individualized suspicion does not exist to search the patron of a public business during the execution of a search warrant. *See Ybarra v. Illinois*, 444 U.S. 85, 90–91, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979).

Not only was Johnson an occupant of the apartment when the warrant was executed, he was individually identified in the search warrant application, known to be a felon, and had been seen at the apartment during a period of short-term traffic. Regardless of whether he was a temporary or permanent occupant of the apartment, the police had a reasonable and articulable suspicion that he was involved in criminal activity. As a result of this suspicion, the police had a right to employ the least intrusive means to detain him and investigate crime. *See United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (applying *Terry* standard to a vehicle stop). In light of the dangerousness of the suspected drug trafficking, and the likelihood that Johnson had access to a weapon, it was reasonable for the police to restrain Johnson's hands. *Muehler v. Mena*, 544 U.S. 93, 100, 125 S. Ct. 1465, 161 L.Ed.2d 299 (2005) (the "safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs"); *Navarrete–Barron*, 192 F.3d at 791.

As the district court found, even if the search of Johnson's pocket was not otherwise proper, the contents of his pocket would have inevitably been discovered. Because the police knew Johnson was a felon and saw a firearm within his reach, they had information sufficient to support the reasonable belief that Johnson was a felon in possession of a firearm. Thus, there was probable cause to arrest Johnson without a warrant. *See United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001). As Officer Nicolino testified, Johnson would have been searched incident to that arrest.

*Id.* at 579–80.

Like the defendant in *Johnson*, Defendant was a person identified in the warrant. In fact, the warrant in the case at bar entitled police to seize a urine sample from

30

Defendant. Moreover, based on the statements of M.M., they had reason to believe Defendant might be armed. Thus, in order to adequately secure the scene in the presence of multiple occupants, to protect law enforcement officers, and to prevent the destruction of evidence, the seizure of Defendant's person was not unconstitutional. Finally, for the same reasons set forth above, the Court should conclude those statements are sufficiently attenuated if it concludes to the contrary regarding the existence of a constitutional violation.

### E.     *Defendant's Fifth Amendment Claim*

#### 1.     *Whether Defendant's Recorded Statements Should be Suppressed*

In addition to the Fourth Amendment claim, Defendant also argues his statements were obtained in violation of Fifth Amendment rights. Under *Miranda*, an individual in custody must be advised of the following before being questioned:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Any individual subject to custodial interrogation, meaning "questioning initiated by law enforcement officers after a person has been taken into custody," must be informed of these rights. *Id*. at 444. An individual is in "custody" if there "was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Interrogation "refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Relying principally on *United States v. Vega*, 676 F.3d 708 (8th Cir. 2012), Defendant contends that his statements were otherwise involuntary despite the

*Miranda* warning he received. (Doc. 17-2 at 10-11.) In *Vega*, the defendant also argued that statements he made during the search of his residence were involuntary because he was not read his *Miranda* rights and the police threatened to have his children taken away. 676 F.3d at 712. Defendant accurately quoted the key passage of *Vega* as follows:

> "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011) (quotation and citation omitted). To determine whether a confession is voluntary, we look at "the totality of the circumstances, examining both the conduct of the officers and the characteristics of the accused." *Id.* (quotation and citation omitted). This court "consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (quotation and citation omitted). Whether a defendant "received Miranda warnings only moments before he made his incriminating statements . . . [is] a consideration [the Supreme Court has] treated as important, although not dispositive," in determining voluntariness. *Rawlings v. Kentucky*, 448 U.S. 98, 107, 100 S. Ct. 2556, 65 L.Ed.2d 633 (1980).
>
> "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *Boslau*, 632 F.3d at 429 (quotation and citation omitted). Although we "review the district court's ultimate determination of voluntariness de novo," we review for clear error "the factual findings underlying that determination." *Id.* (quotation and citation omitted).

(Doc. 17-2 at 10 (quoting *Vega*, 676 F.3d at 718).) In *Vega*, there was a dispute regarding whether officers read the defendant his rights or made threats. *Id.* at 717-18. Here, Sergeant Ward clearly read Defendant his *Miranda* rights and Defendant stated that he understood them. Sergeant Ward asked Defendant if, with those rights in mind, he wanted to answer questions and Defendant expressed his willingness to talk. Contrary to Defendant's assertion, there is no evidence of coercion based on the possible "penalty

32

that other of his family members would or may be charged with criminal offenses resulting from the subject matter of the investigation." (Doc. 17-2 at 11.) I see no evidence of any such coercion. After giving Defendant his *Miranda* warnings and ascertaining Defendant's understanding and willingness to speak with him, Sergeant Ward simply started asking Defendant about his marijuana use. (Gov. Ex. 4 at 1:15.) Defendant readily answered these inquiries. No threats were made. As stated above, this interview appeared to be cordial. As in *Vega*, applying the totality of the circumstances, the Court should conclude Defendant's statements were voluntary. 676 F.3d at 718. I recommend the Court deny this part of Defendant's motion.

## 2. *Whether Defendant's Statements Prior to the Recorded Interview Require Suppression of any Evidence*

The record is silent about what caused Sergeant Ward to tell Defendant after administering the *Miranda* warning, "Obviously you have some marijuana. I know that you said out there, that's kind of your drug of choice." (Gov. Ex. 4 at 1:14.) Although this points to some incriminating statement by Defendant, the circumstances of Defendant's prior statement, such as whether he was interrogated, whether he volunteered the information, whether he was handcuffed, or what, if any, contraband had already been discovered when he made the statements are unknown.

The parties' arguments and the evidence focus entirely on the videotaped interview. In fact, the issue addressed in this section was not mentioned in the parties' briefs or at the hearing. Rather, the issue occurred to me as I reviewed the video. In other words, although the parties have not mentioned it, I feel compelled to address this apparent omission in the testimony and the arguments presented.

This Court has previously addressed the burden of proof to establish whether statements were the product of custodial interrogation:

"Interrogation in the [*Miranda*] context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). As a general rule, "a mere factual statement . . . . serv[ing] to inform the suspect as to the status of his case or the investigation into his activities" does not constitute interrogation. *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). Neither does asking "for routine information necessary for basic identification purposes," unless "the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged." *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (quoting *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996)). Spontaneous, volunteered statements are not the product of interrogation, and "[a]n officer's request for clarification of a spontaneous statement generally does not constitute interrogation," unless the follow-up question "attempted to enhance [the defendant's] guilt." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (quoting *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989). "The government bears the burden of proving by a preponderance of the evidence that a defendant's statements were not the product of a custodial interrogation." *United States v. Koons*, No. CR00-3041-MWB, 2001 WL 34008498, at *8 n.1 (N.D. Iowa Apr. 26, 2001) (citing *Miranda*, 384 U.S. at 475); *see also Holman v. Kemna*, 212 F.3d 413, 418-19 (8th Cir. 2000) ("constru[ing] the ambiguity in the record in favor of [the defendant to] . . . conclude that [the defendant] was subject to interrogation"); *United States v. Sepulveda-Sandoval*, 729 F. Supp. 2d 1078, 1097-98 (D.S.D. 2010) (adopting report and recommendation) (noting that district courts are split regarding the burden of proof and that the Eighth Circuit has not addressed the issue).

*U.S. v. Ross*, 17-CR-4071-LTS-1, 2018 WL 3091623, at *11 (N.D. Iowa Apr. 11, 2018) (alterations in original), *R. & R. adopted*, 2018 WL 1911344 (N.D. Iowa Apr. 23, 2018).

I concur with *Ross* that the Government bears the burden of proving that a defendant's statements, including any he made prior to receiving *Miranda* warnings, were not the product of a custodial investigation. The record tends to show that Defendant was in custody prior to entering the bedroom for the videotaped interview. However, it

is not clear when Defendant was handcuffed or the other circumstances surrounding these prior statements. Sergeant Ward testified Defendant was not free to leave prior to completion of the search. Whether Defendant's statements were the product of interrogation is even more obscure. There is no evidence regarding whether Defendant volunteered information about drugs or responded to questions from law enforcement.

While the record is unclear and the Government bears the burden of proof, I cannot recommend that the Court find the Government has failed in its burden on this issue. Rather, it appears that Defendant failed to assert an argument based on Defendant's pre-*Miranda* statements that would have alerted the Government (and the Court) to this issue. Defendant's brief focused principally on the facts surrounding the search warrant. Regarding the statements, Defendant recites the following facts:

> During the May 20th search of the defendant Chan-Vance's residence, and as reflected in officer Ward's subsequent police report [which is not in evidence] concerning that search and individuals interrogated at that residence during the search, local police officers questioned Chan-Vance while the search was ongoing (the officers do claim that *Miranda* "warnings" were provided) and that Chan-Vance purportedly made statements against interest concerning his marijuana use and ownership of a handgun.

(Doc. 17-2 at 8.) The Government's recitation of the facts also contains no reference to Defendant's pre-*Miranda* statements or the circumstances surrounding them. (Doc. 24-1 at 4-5.)

As addressed above, Defendant argued that his statements were the product of a Fourth Amendment violation. He also argued there was a Fifth Amendment violation because, even if he received a *Miranda* warning, his statements were otherwise involuntary. Although Sergeant Ward's statements on the video point to the possible existence of prior statements, nothing about Defendant's argument indicates any awareness of their existence or demonstrates any intent to differentiate these statements

from the post-*Miranda* statements he contends were involuntary. His inventory seeks to suppress "[a]ll statements made by the defendant to Marion police Officer Ward and Investigator Gibson [sic] during their interview or interrogation of the defendant and at the defendant's residence on May 20, 2019." (Doc. 18 at 1.) While this could be read broadly to encompass any statements made at the residence, in the context of the arguments presented and the evidence adduced at the hearing, I do not read it to constitute a claim that anything other than the videotaped statements should be suppressed. The arguments Defendant expressly raised cannot reasonably be stretched to assert, for example, that pre-*Miranda* custodial interrogation led to involuntary admissions and, therefore, the post-*Miranda* admissions were the fruit of the poisonous tree.

Thus, although I have identified this as a potential issue, I recommend the Court conclude that Defendant has not asserted an argument to suppress statements based on anything he may have said prior to the recorded interview. If the Court disagrees with me regarding this conclusion and finds it is appropriate to reopen the record for further evidence on this issue, I recommend that Court remand the matter to me for an additional evidentiary hearing and, if necessary, briefing.

## F.    *Defendant's Argument that 18 U.S.C. Section 922(g)(3) is Unconstitutionally Vague*

Defendant argues that the indictment must be dismissed because the statute is unconstitutionally vague as applied to him. The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. An "essential" feature of the due process guarantee is "[t]he prohibition of vagueness in criminal statutes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). A law is unconstitutionally vague if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so    standardless    that    it    authorizes    or    encourages    seriously    discriminatory

enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."); *United States v. Turner*, 842 F.3d 602, 604 (8th Cir. 2016) ("A criminal statute is unconstitutionally vague in violation of the Fifth Amendment due process clause if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.") (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015)) (brackets in original).

This argument has arisen previously before the Court, with the most thorough analysis to date appearing in *United States v. Stupka*, wherein Chief Judge Leonard T. Strand stated, "a district court must wait until the facts of a case are fully developed at trial before ruling on an as-applied vagueness challenge." 418 F. Supp. 3d 402, 406 (N.D. Iowa 2019) (citing *Turner*, 842 F.3d at 605). More recently, Judge C.J. Williams upheld my recommendation that a ruling on an as-applied challenge to the same statute that is at issue in this case was premature. *United States v. Gantt*, 20-CR-2020 CJW-MAR, 2020 WL 5653983, at *11 (N.D. Iowa Sept. 23, 2020). Indeed, Defendant seems to acknowledge the challenge is premature, but seeks to preserve the challenge for trial: "The [*Stupka*] rule applies to this case—the trial evidence will show that the criminal statute as applied to Chan-Vance is unconstitutional under the Fifth Amendment, and that he will be entitled to a dismissal with prejudice of the charge as a result." (Doc. 17-2 at 13.)

Generally, pretrial motions should be ruled on unless there is "good cause to defer the ruling." Fed. R. Crim. P. 12(d); *Turner*, 842 F.3d at 605. I find that good cause exists to defer ruling on this motion because the "facts surrounding the commission of

the alleged offense" will assist in determining whether Defendant was a drug user within the meaning of the statute. *See Turner*, 842 F.3d at 605. Thus, Defendant's as applied vagueness challenge should "not be ruled upon without a 'trial on the merits.'" *Id.* (citing *United States v. Covington*, 395 U.S. 57, 60 (1969); Fed. R. Crim. P. 12(b)(1)); *see also Stupka*, 418 F. Supp. 3d at 406 ("[A] district court must wait until the facts of a case are fully developed at trial before ruling on an as-applied vagueness challenge.") (citing *Turner*, 842 F.3d at 605). Accordingly, I recommend the Court hold this part of Defendant's motion in abeyance until the facts of the case are fully developed at trial.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress and **hold in abeyance** Defendant's Motion to Dismiss. **(Doc. 33)**. Specifically, I recommend that the Court hold in abeyance Defendant's as-applied challenge under 18 U.S.C. Section 922(g)(3) and deny the motion in all other respects.

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 3rd day of February, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa