# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

ANTHONY JON CHAN-VANCE,

               Defendant.

No. 20-CR-86-CJW-MAR

**ORDER**

---

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................ 2

II.    STANDARD OF REVIEW.................................................... 2

III.   RELEVANT BACKGROUND ............................................. 5

IV.   ANALYSIS....................................................................... 11

     A.    Legal Standard.................................................... 12

     B.    Reliability of M.M. ............................................. 14

     C.    Sufficient Nexus to the Residence .................... 17

     D.    *Leon* Good Faith Exception ............................... 19

     E.    Defendant's Statements ...................................... 21

     F.    Other Uncontested Findings................................ 26

V.     CONCLUSION................................................................. 26

# I.    INTRODUCTION

This matter is before the Court on defendant's objections (Doc. 31) to the Honorable Magistrate Judge Mark A. Roberts' Report and Recommendation ("R&R") (Doc. 30) which denied defendant's motion to suppress and held in abeyance a ruling on defendant's motion to dismiss (Doc. 17).  The government did not object to the R&R.

For the following reasons, the Court **overrules in part** and **sustains in part** defendant's objections, **adopts in part** and **rejects in part** Judge Roberts' R&R with modification, **denies** defendant's motion to suppress, and **denies as moot** defendant's motion to dismiss.

# II.    STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo.  28 U.S.C. § 636(b)(1).  In the absence of an

objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full de novo review" if the record is concise. *Id*. Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection

3

and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline

4

standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III.    RELEVANT BACKGROUND

After reviewing the record, the Court finds that Judge Roberts accurately and thoroughly set forth the relevant facts in his R&R. (Doc. 30, at 4–10). Although defendant objects that Judge Roberts' factual findings are "[u]nfounded" or "[i]ncomplete," the substance of defendant's objections go to Judge Roberts' assessment of whether probable cause existed to support the search warrant at issue. *See* (Doc. 31, at 3–7). Defendant does not argue, for example, that Judge Roberts omitted or misstated material facts. Thus, the Court overrules defendant's factual objections and adopts Judge Roberts' factual findings as set forth below without modification. The Court will consider the legal substance of defendant's factual objections in its analysis.

### A.    *M.M. Provides Information Leading to the Arrest of A.M.*

Sergeant Ward, who authored the search warrant application at issue, was principally responsible for the investigation and execution of the warrant. At the time of the hearing, Sergeant Ward was assigned to the patrol division. However, at the time of the search of Defendant's

5

residence, he was an investigator; that is, he undertook investigations of offenses that took longer than a single shift to complete. Attachment A to the Application for Search Warrant ("the attachment") lists Sergeant Ward's qualifications, including that he is a sworn police officer, he has been trained in narcotics and other criminal investigations, and he has been assigned to the Drug Enforcement Agency's Drug Task Force. (Gov. Ex. 1 at 4.) Sergeant Ward has authored between 50 and 100 search warrants for the Marion Police Department ("MPD") or as a task force officer with the Drug Enforcement Agency. (Ward Hr'g Test.) The attachment states, among other things, that at the time of the warrant application, Sergeant Ward had been a police officer for twelve years, with four years in the investigations division. (Gov. Ex. 1 at 4.) The attachment also includes reference to his experience and training concerning drug-related crimes. (*Id.*)

Unless otherwise noted, Sergeant Ward testified to the following facts. On the weekend of May 12, 2019, Sergeant Ward was called out to interview M.M. M.M. had previously spoken with other police officers about her husband, A.M. M.M. and A.M. were going through a divorce.

Prior to Sergeant Ward's involvement, M.M. told an MPD patrol officer that A.M. was driving into Marion without a valid driver's license and that he possessed narcotics, possibly in his vehicle. Law enforcement somehow identified the vehicle A.M. was driving and traced it to its owner, T.M. T.M. and A.M. are siblings. T.M.'s listed address is 1240 First Avenue, Marion, Iowa ("the First Avenue residence"), where the search at issue occurred. T.M. was Defendant's fiancé.

A patrol officer located A.M. and made contact with him at a convenience store. A.M. told the officer he had marijuana in the center console of his vehicle. An open-air sniff of the vehicle was performed by another officer's canine partner who "alerted," presumably to the presence of illegal drugs. A subsequent search located multiple containers with marijuana, THC, an Alprazolam tablet, and drug paraphernalia in the vehicle. A.M. was arrested for possession of the drugs and transported to the Linn County Correctional Center. Keys to the vehicle he had been driving were delivered to the First Avenue residence.

The affidavit states that Officer J. Gallagher relayed to Sergeant Ward information about statements made by M.M. on May 12, 2019,

including that A.M. had been selling methamphetamine to patients at a Cedar Rapids methadone clinic,[1] that he kept narcotics at his sister's residence (the First Avenue residence), and that drugs were hidden in the drop ceiling of the residence. (*Id.* at 8–9.) The affidavit also notes that Officer T. Peterson spoke with M.M., that she told him A.M. sold marijuana, and that she had found several bags of marijuana at their residence at 1315 22nd Avenue SW, Cedar Rapids, Iowa. (*Id.* at 9.) She also informed Officer Peterson that she had been at the First Avenue residence on May 9, 2019 and had seen a large freezer bag containing marijuana in an igloo cooler. (*Id.*)

Sergeant Ward then interviewed M.M. at her residence. His affidavit provides the following relevant details of that interview:

- M.M. and A.M. are in the process of divorce.

- M.M. claimed that A.M. told her "everything."

- A.M. is "staying and living" with his sister T.M. and Defendant at the First Avenue residence.

---

[1] The affidavit states, "Officer Gallagher advised [M.M.] had information that [A.M.] was selling methamphetamine to patients at the methadone clinic in Cedar Rapids, Iowa." (Doc. 25, at 8). Defendant interpreted this statement to mean that some officer told M.M. that A.M. was selling methamphetamine. (Doc. 17-2, at 2). Judge Roberts found that defendant's interpretation made little sense and instead found that the statement meant that M.M. informed Officer Gallagher of the information who in turn told Sergeant Ward, the affiant. (Doc. 30, at 5 n.3). Defendant reasserts his interpretation in his objections and argues that this information is immaterial because it does not relate to the residence searched. (Doc. 31, at 3 n.1).

The Court finds that Judge Roberts' interpretation is the only reasonable way to understand the sentence. Although this statement is indeed not a model of clarity, it is far from total ambiguity. In other words, the sentence is best understood as "Officer Gallagher advised [me that] [M.M.] had information that [A.M.] was selling methamphetamine," not "Officer Gallagher advised [M.M.] [that someone in the police department] had information that [A.M.] was selling methamphetamine." Given that this statement indicates that M.M. was privy to A.M.'s criminal activity, it is relevant here even though it does not concern the residence searched as will be discussed further below.

- A.M. and Defendant store marijuana and methamphetamine ICE at the First Avenue residence.

- M.M. recalled seeing a large igloo cooler on May 9, 2019 at the First Avenue Residence with a freezer bag full of marijuana.

- She reported that Defendant always carries a small handgun because he had upset people "in the drug trade world."

- She had been told that Defendant and A.M. store narcotics in the drop ceiling of the basement laundry room.

It is also noteworthy that M.M. provided law enforcement a small amount of marijuana and some drug paraphernalia she had found while cleaning out A.M.'s remaining belongings at her Cedar Rapids residence. (*Id.*)

During the interview, M.M. received a telephone call from A.M. from the Linn County Jail. A.M. reported that he knew police were at the Cedar Rapids residence because his sister, T.M., could see police vehicles from "up the street." (*Id.*) It was not explained why T.M., who resides in Marion, was near the Cedar Rapids residence. The affidavit reports that "[M.M.] and [A.M.] then began to argue about A.M. selling and using narcotics." (*Id.*)

### B. Obtaining the Warrant

Sergeant Ward prepared and obtained a search warrant for the First Avenue residence where he believed Defendant, A.M., and T.M. resided. Sergeant Ward testified regarding the process that resulted in the issuance of a search warrant by Iowa Sixth Judicial District Associate Judge Angeline Johnston on May 13, 2019. Judge Johnston has been a judge for thirteen years.

Sergeant Ward testified that he prepared the application for the search warrant contained in Government Exhibit 1. While the application is largely self-explanatory, it does bear some discussion. The application first describes the places to be searched: a single-family dwelling; electronic digital evidence; and the urine of T.M., A.M., and Defendant. (Gov. Ex. 1 at 13.) It describes more particularly the evidence or contraband being

sought, including but not limited to controlled substances, drug paraphernalia locked containers were such items may be secreted, drug manufacturing items weapons, money, and the aforementioned urine. (*Id.* at 14.)

In addition to the description of Sergeant Ward's training, the attachment also contains a description of what he believes about drug users based on his experience with drug users or traffickers and the records they keep and how they keep them, photographs they take and store, drug paraphernalia they maintain, their use and possession of firearms, currency and other means of exchange, electronic devices used by them, how they use vehicles, and that bodily fluids may contain evidence of drug use. (*Id.* at 3–4.)

Sergeant Ward testified that Judge Johnston crossed out and initialed Attachment B relating to confidential informants because no confidential informant was being used. Sergeant Ward also testified that there is a requirement that an affiant confer with a Linn County attorney about a warrant application for warrants that are "done during daytime hours." Presumably, this refers to warrants that are applied for during the daytime and not to warrants that are sought at night because of some emergency. Sergeant Ward also testified that Linn County Attorneys do not always sign warrants. In this case, it is not clear whether a Linn County Attorney did, in fact, confer with Sergeant Ward or why the warrant application was not signed by a Linn County Attorney.

## C.    *The Search*

Sergeant Ward testified that the search of the First Avenue residence commenced on May 20, 2020 at about 7:00 a.m. Sergeant Ward and Investigator Gilson appeared to have been principally responsible for conducting the search and associated interviews as detailed below. They were accompanied at the outset of the search by the MPD SWAT Team. When the officers arrived, they encountered T.M. and a man named L. whose last name Sergeant Ward could not recall. Defendant was inside but came out as officers were speaking with T.M. and L. Inside the residence were five children related to Defendant. Arrangements were made for the children to be picked up and taken elsewhere before the search commenced.

9

Exhibit 2 is an inventory of items seized from Defendant's residence during the search. The northwest bedroom where items A-1 through A-7 were seized appeared to have been occupied by Defendant and his fiancée T.M. (Ward Hr'g Test.) The Ruger handgun referred to in the indictment was in the closet of the northwest bedroom. (Gov. Ex. 2 at 2; Gov. Ex. 3 at 4, 5.) Sergeant Ward testified that multiple items consistent with marijuana use and marijuana itself, as well as forms of THC, were located in the northwest bedroom. (Gov. Ex. 2 at 2.)

A.M. appeared to be using the downstairs south bedroom. (Ward Hr'g Test.) A yellow igloo cooler consistent with the description provided by M.M. was found in the bedroom occupied by her husband. (Gov. Ex. 2 at 2; Gov. Ex. 3 at 2, 3, 6, 7.) While no drugs were recovered from inside the cooler, "vape cartridges" were located on or near the cooler. (Gov. Ex. 2 at 2; Ward Hr'g Test.) Because M.M. had told law enforcement that drugs were stored in a ceiling, the investigators attempted to locate contraband in such places but did not find any. (Ward Hr'g Test.)

### D.    The Interview with Defendant

After the children had been removed from the First Avenue residence, officers interviewed Defendant, T.M., and L. Defendant seeks to suppress the statements he made in a video-recorded interview conducted by Sergeant Ward in a bedroom of the First Avenue residence. Sergeant Ward was familiar with Defendant from a prior federal criminal investigation in which Defendant was a witness who testified before the grand jury. Sergeant Ward characterized Defendant as always having been "completely respectful of myself and other officers when I've been around." (Ward Hr'g Test.)

Sergeant Ward testified that Defendant was given a *Miranda* warning at the commencement of the recorded interview. It appears Defendant made some statements to law enforcement about marijuana use prior to the recorded interview and, apparently, he was discovered to have possessed marijuana. The video commences with Defendant being ushered, in handcuffs, into a bedroom. (Gov. Ex. 4 at 00:09.) Immediately after providing the *Miranda* warning and Defendant waiving his right to remain silent and agreeing to speak to officers, Sergeant Ward stated, "Obviously you have some marijuana. I know that you said out there, that's kind of your drug of choice." (*Id.* at 1:14.) It also appears from the ensuing

10

conversation that law enforcement had already found marijuana on Defendant's person and in a bag. (*Id.* at 3:49-4:00.) Defendant first denied that the search would disclose a gun, but later admitted they would find his Ruger handgun in the closet. (*Id.* at 4:10, 10:19.)

Sergeant Ward characterized their discussion on the day of the search as casual and described Defendant as "lighthearted" and "good-natured." (Ward Hr'g Test.) Investigator Gilson described Defendant's tone as "friendly and at times joking." (Gilson Hr'g Test.) Having reviewed the video, I agree with this assessment. Sergeant Ward and Investigator Gilson conducted the post-*Miranda* interview of Defendant away from other occupants of the residence. The video of the interview shows Defendant was seated on some piece of furniture. (Gov. Ex. 4.) Investigator Gilson was standing and Sergeant Ward was seated on the floor. Sergeant Ward testified that Defendant was not free to leave until after the search had been completed.

(Doc. 30, at 4–10) (footnote added, original footnotes omitted).

On October 14, 2020, a grand jury issued an Indictment charging defendant with one count of being an unlawful user of marijuana in possession of a firearm in violation of Title 18, United States Code, Sections 922(g)(3) and 924(a)(2). (Doc. 2). In his motion to dismiss, defendant argues that Sections 922(g)(3) and 924(a)(2) are unconstitutionally vague as applied to him and, thus, the charge against him should be dismissed. (Doc. 17). In his motion to suppress, defendant seeks to suppress evidence seized from and statements he made during the May 20, 2019, search of his residence. (*Id.*). The government timely filed a resistance to defendant's motions. (Doc. 24).

## IV.   ANALYSIS

As an initial matter, defendant does not object to Judge Roberts' conclusion that a ruling on his motion to dismiss must be held in abeyance. (Docs. 30, at 36–38; 31, at 2); *see, e.g.*, *United States v. Stupka*, 418 F. Supp. 3d 402, 406 (N.D. Iowa 2019) ("[A] district court must wait until the facts of a case are fully developed at trial before ruling on an as-applied vagueness challenge.") (citation omitted). Following his objections,

however, defendant entered a conditional guilty plea which preserved his right to appeal the Court's ruling on his motion to suppress but not on his motion to dismiss. (Doc. 37). Thus, the Court finds that defendant's motion to dismiss is now **moot**, and it is therefore **denied** as such.

Defendant does, however, object to Judge Roberts' analysis of his motion to suppress in several respects. First, defendant argues Judge Roberts' discussion of the applicable legal standards was materially incomplete. (Doc. 31, at 7–10). Second, defendant asserts Judge Roberts erred in finding that information provided by M.M. was reliable and supported probable cause for the issuance of the warrant. (*Id.*, at 10–12). Third, defendant argues Judge Roberts erred in finding that there was a sufficient nexus between the criminal activity and the residence searched in light of M.M.'s information. (*Id.*, at 13). Fourth, defendant asserts that Judge Roberts erred in concluding that the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984) spared the warrant here even if probable cause was lacking. (*Id.*, at 13–15). Last, defendant concludes that Judge Roberts erred in alternatively finding that defendant's statements should not be suppressed even if the search was unconstitutional under the attenuation doctrine. (*Id.*, at 15–16). The Court will address each objection in turn.

### A.   *Legal Standard*

In his R&R, Judge Roberts laid out the standard for probable cause. (Doc. 30, at 12–13). Defendant argues that Judge Roberts omitted a critical principle here; that information provided by an identified informant who has no history of credibility must be sufficiently corroborated by independent evidence to support probable cause to issue a warrant. (Doc. 31, at 7–10) (citing *United States v. Leppert*, 408 F.3d 1039, 1041–42 (8th Cir. 2005)). Defendant argues that because M.M. was an identified informant with no history of providing credible information, her statements were not self-authenticating and further corroboration was necessary for her statements to support probable cause.

12

(*Id.*, at 3–4, 9–10).  Defendant concludes it was error for Judge Roberts to omit this aspect of probable cause from his review of the legal standards.

Defendant is correct that "[a]n [identified] informant's tip may be sufficiently reliable to support a probable-cause determination if the informant has previously provided reliable information or if the tip is 'corroborated by independent evidence.'" *Leppert*, 408 F.3d at 1041 (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).  Although Judge Roberts did not cite this exact legal principle in laying out the probable cause standard, he did acknowledge that "an [identified] informant's veracity, reliability and basis of knowledge are all highly relevant in determining whether probable cause exists[.]"  (Doc. 30, at 13) (quoting *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (citation and internal quotation marks omitted)).  It is clear Judge Roberts knew that an identified informant's information was not self-authenticating and required some indicia of reliability or form of corroboration to be relied upon.  Further, in applying the standard, Judge Roberts laid out the facts and circumstances which corroborated M.M.'s statements here.  (*Id.*, at 16–17).

Thus, after de novo review, the Court finds that Judge Roberts did not err in laying out or applying the legal standard here.  Judge Roberts' discussion of the law and the facts reflects that he correctly understood that statements from an identified informant with no history of reliability required some amount of independent corroboration.  It also shows that Judge Roberts did not simply accept the informant's statements absent corroboration.  Defendant's objection on this ground is **overruled**.

## B. Reliability of M.M.

Defendant objects to Judge Roberts' analysis of M.M.'s reliability. (Doc. 31, at 3–7, 10–12).[2] Defendant highlights that the government did not call M.M. to testify at the suppression hearing. (*Id.*, at 10). Instead, the government only called Sergeant Ward and Investigator Gibson, both of whom Judge Roberts found to be credible. (*Id.*, at 3, 10); *see also* (Docs. 28; 30, at 3). In essence, defendant argues that Judge Roberts put the cart before the horse in finding that the officers and the information provided by M.M. were credible without addressing whether M.M. herself was credible. (*Id.*, at 10). Defendant argues that M.M. was not credible because she had no history of credibility with the officers and was in the process of divorcing A.M., thus giving her a motive to falsely report that he—and apparently by extension defendant—was involved in criminal activity. (*Id.*, at 3–5, 10). Defendant then alleges in his objection to Judge Roberts' R&R, for the first time and based only on "information and belief," that M.M. falsely reported A.M., T.M., and defendant to police on three other occasions after she first provided the underlying information here. (*Id.*, at 11–12, 16). In sum, defendant argues that Judge Roberts erred in focusing on the credibility of the officers as opposed to M.M., who had a motive to lie and whose information was not sufficiently corroborated. (*Id.*, at 10–12).

First, the Court sees no error in Judge Roberts' finding that the testifying officers were credible. Judge Roberts, by virtue of presiding over the suppression hearing was in a superior position to assess the officers' credibility as witnesses. *See United States v. Schafer*, 608 F.3d 1056, 1065 (8th Cir. 2010) ("A credibility finding made by a magistrate judge after a hearing on the merits of a motion to suppress is virtually

---

[2] Defendant's arguments in this section bridge into whether the information M.M. provided to officers created a sufficient nexus such that there was probable cause to search the residence at issue. (Doc. 31, at 10–12). The Court will address those arguments in the next section.

unassailable on appeal.") (citation and internal quotation marks omitted). Defendant offers no reason to doubt this finding.

Second, the Court sees no error in Judge Roberts' discussion of the reliability of M.M.'s information or her credibility as an informant. The Court is not aware of any requirement that informants testify at suppression hearings for the information they provided in support of warrants to be found sufficiently credible. Despite the absence of M.M.'s direct testimony, Judge Roberts addressed her potential bias. (Doc. 30, at 14–15). Judge Roberts ultimately found that there was no indication that M.M.'s cooperation with officers was done out of divorce-related spite but that, even if it was, such a motive did not cause her to become inherently unreliable. (*Id.*) (citing *United States v. Coplen*, 533 F.3d 929, 931 (8th Cir. 2008) (holding that a cooperating witness's motive did not make them "inherently unreliable")). The Court declines to consider defendant's allegations that M.M. falsely reported A.M. and others to police on other occasions, both because these allegations were not timely raised and because they rest only upon information and belief. The Court has no evidence before it to support these allegations. Defendant had the right to call M.M. or others to testify at the suppression hearing and examine M.M.'s credibility in open court. Defendant elected not to. Instead, defendant relied solely on his cross-examination of the government's witnesses and now asks the Court to second-guess Judge Roberts based on evidence that is not before it. (Doc. 28). The Court declines to do so. Moreover, even if these allegations are true, there is no evidence that the officers here were aware of them and thus had greater reason to doubt the veracity of M.M.'s statements, particularly because it appears these reports allegedly happened at an unspecified time *after* her initial statements.[3]

---

[3] Defendant requests a hearing on this issue. (Doc. 31, at 12, 16). The Court finds such a hearing unnecessary in light of its analysis and conclusion that Judge Roberts did not err on this

Last, the Court also sees no error in Judge Roberts' finding that M.M.'s statements were sufficiently corroborated such that the officers appropriately relied on them. *See United States v. Koons*, 300 F.3d 985, 991 (8th Cir. 2002) ("An officer 'may rely upon information received through an informant . . . so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'") (quoting *Illinois v. Gates*, 462 U.S. 213, 242 (1983)). Judge Roberts did not base his finding on the fact that M.M. had a history of providing credible information because no such prior history exists. Rather, Judge Roberts focused on corroboration in this investigation and other indicia of reliability. Judge Roberts credited to a limited extent that A.M. told M.M. about the alleged drug distribution scheme. (Doc. 30, at 15–16). Judge Roberts noted the specificity of the information provided by M.M., that M.M. provided accurate information about A.M.'s possession of drugs in his vehicle, that M.M. provided officers with marijuana and drug paraphernalia that she reported belonged to A.M., and that A.M. and M.M. had discussed A.M.'s sale of drugs on the phone while M.M. was with police searching a different residence. (*Id.*, at 16–17). These facts corroborated M.M.'s statements to officers and made reliance on her statements reasonable. Given that M.M. reasonably appeared to be privy to A.M.'s alleged criminal activity,[4] M.M. could recount specific details of the alleged drug distribution scheme, M.M. provided purported physical evidence to officers, and M.M. correctly reported that A.M. had drugs in his

issue. Moreover, defendant provides no explanation as to why he could not have raised these allegations and presented evidence on them at the evidentiary hearing.

[4] Moreover, M.M. appeared to be privy to defendant's alleged criminal activity. As Judge Roberts noted, M.M. told officers that defendant always carried a firearm on his person because he had purportedly upset people in the drug trade. (Doc. 30, at 6, 14). Although the Court acknowledges the right to bear arms, as defendant notes (Doc. 31, at 5 n.2), M.M.'s report gave officers reason to believe defendant was in unlawful possession of a firearm, particularly in light of the corroborating circumstances discussed herein. Further, if M.M. was indeed motivated by spite against A.M., it is unclear why she would directly implicate defendant in criminal activity.

vehicle, officers had more than enough reason to find her credible. *See United States v. Reiner Ramos*, 818 F.2d 1392, 1397 n.7 (8th Cir. 1987) ("The theory connecting reliability and corroboration is that an informant who is correct about some things more likely will be correct about critical unverified facts[.]") (quoting *United States v. Reivich*, 793 F.2d 957, 960) (8th Cir. 1986)).

Thus, after de novo review, the Court finds that Judge Roberts did not err in deeming the officers here credible and finding that the officers reasonably relied on M.M.'s statements given the sufficient corroborating circumstances identified. Judge Roberts appropriately considered M.M.'s reliability as an informant by addressing her potential bias and the circumstances lending credibility to her reports. Defendant's objection on this ground is **overruled**.

### C.  *Sufficient Nexus to the Residence*

Defendant argues that Judge Roberts erred in finding that M.M.'s statements created a sufficient nexus between the criminal conduct being investigated and the residence searched. (Doc. 31, at 4–6, 10–11, 13). Defendant argues that the vast majority of M.M.'s statements to officers did not relate to the residence searched. (*Id.*). Defendant argues that M.M.'s bare statements that she observed a cooler filled with marijuana at the residence and that she was told by a third-party that there were drugs in a drop-down ceiling in a basement laundry room at the residence were insufficient to connect the alleged criminal activity to the residence. (*Id.*). Defendant reiterates that no marijuana was recovered from a cooler found at the residence and the residence did not even have a drop-down ceiling. (*Id.*, at 4–5, 10–11). Defendant ultimately argues that M.M.'s statements were insufficient to support probable cause and officers should have done more to "beef-up" their investigation before searching the residence. *See, e.g.*, (*Id.*, at 5–6).

The Court finds that Judge Roberts did not err on this issue. As stated in his R&R, "[p]robable cause requires only a 'fair probability,' and not a certainty, that contraband will be found at the premises to be searched[.]" (Doc. 30, at 18) (quoting *Reivich*, 793 F.2d at 960). As discussed above, the officers found M.M. to be a credible source because she appeared to be privy to the alleged criminal activity, produced purported physical evidence relating to such activity, and accurately relayed other criminal conduct by A.M. These facts gave the officers a reasonable basis to believe M.M. would be correct about other unverified facts. *See Reiner Ramos*, 818 F.2d at 1397 n.7. Thus, the officers reasonably relied on her statements connecting the criminal activity being investigated to the residence at issue, i.e. that she knew A.M. and defendant were involved in drugs and both lived at the residence, that she had recently observed marijuana in a cooler at the residence, and she had heard from a third-party that drugs were being stored at the residence.

That there was no marijuana in the cooler found at the residence and no drop-down ceiling containing drugs has no bearing on the existence of probable cause prior to the search. "[C]ourts have never imposed a requirement of infallibility on police informants." *United States v. Deepe*, 728 F.2d 1168, 1170 (8th Cir. 1984). The officers here reasonably found M.M. to be a credible source and her statements reasonably led them to believe there was a fair probability of recovering contraband from the residence regardless of whether M.M.'s information was ultimately correct. Thus, it was not necessary for the officers to further "beef-up" their investigation because they already had sufficient probable cause and a sufficient nexus to the residence. That the cooler was movable is immaterial in light of the fact that M.M. reported that she recently observed it and M.M.'s other allegation that drugs were being stored in the ceiling. *See* (Doc. 31, at 9). That officers did not previously suspect that A.M. or defendant had drugs at the residence is also immaterial in light of the above analysis. There is no requirement that

18

officers must have previously suspected criminal activity before being alerted of such activity by a reliable informant.

Thus, after de novo review, the Court finds that Judge Roberts did not err in finding that M.M.'s statements created a sufficient nexus between the alleged criminal activity and the residence searched. In sum, the Court finds that Judge Roberts' conclusions on probable cause are correct and proper. Defendant's objection on this ground is **overruled**.

### D. Leon *Good Faith Exception*

Defendant objects to Judge Roberts' finding that the *Leon* good faith exception should apply even if the warrant lacks probable cause. (Doc. 31, at 13–15).

In *Leon*, the Supreme Court "created the good-faith exception to the exclusionary rule." *United States v. Johnson*, 78 F.3d 1258, 1261 (8th Cir.1996) (citing *Leon*, 468 U.S. at 922). In explaining the need to create a good faith exception to the exclusionary rule, the Supreme Court reasoned that:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

*Leon*, 468 U.S. at 921 (alteration, citation, and internal quotation marks omitted). Under *Leon*'s good-faith exception, the Fourth Amendment exclusionary rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid." *United States v.*

19

*Taylor*, 119 F.3d 625, 629 (8th Cir. 1997) (citing *Leon*, 468 U.S. at 905, 922–23). "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916.

The Eighth Circuit Court of Appeals has outlined four circumstances when an officer's reliance on a warrant would be unreasonable: (1) the officer's affidavit included information the officer knew was false or should have known was false; (2) the affidavit is so lacking in probable cause such that the officer's reliance was objectively unreasonable; (3) the judge failed to act in a neutral and detached manner; or (4) the warrant is so facially deficient that the officer cannot reasonably presume it to be valid. *See United States v. Phillips*, 88 F.3d 582, 586 (8th Cir. 1996) (citing *Leon*, 468 U.S. at 923).

Defendant's only objection here is that the warrant was so lacking in probable cause that the officers' reliance on it was unreasonable even though it was approved by a magistrate judge. (Doc. 31, at 13–14). The Court disagrees. As discussed, M.M. provided earlier information to police about A.M.'s involvement in drugs that proved to be correct, she provided marijuana and drug paraphernalia to police which purportedly belonged to A.M., she relayed detailed information about the alleged drug distribution scheme and explained that she obtained this information from A.M., and she reported personally observing marijuana at the residence as well as hearing from others that drugs were stored at the residence. The officers here were not unreasonable in relying on the magistrate judge's determination that these circumstances constituted probable cause, i.e. that there was a fair probability that drugs would be recovered from the residence. These allegations are not so bare, unspecific, or unreliable that any reasonable officer would conclude that they lacked probable cause to search the residence despite a magistrate judge finding as such.

20

The fact that Sergeant Ward did not follow what may be the typical process for obtaining the warrant, *see* (Docs. 30, at 8; 31, at 14), is immaterial in light of the information provided and the magistrate judge's findings. It is not unlawful or strikingly abnormal for an affiant to bypass the county prosecutor and take a warrant application directly to the issuing magistrate during nighttime hours. (Doc. 30, at 8). That Sergeant Ward did not first confer with the Linn County Attorney's Office would not lead a reasonable officer to believe that the warrant fundamentally lacked probable cause. Defendant also notes that the warrant was issued by a state court and executed by local officers in Iowa, a state which does not recognize the *Leon* good faith exception. (Doc. 31, at 14 n.4) (citing *State v. Cline*, 617 N.W.2d 277, 292–93 (Iowa 2000) (en banc)). This argument may have some cachet if it were made in state court. This is a federal district court, however. The Eighth Circuit Court of Appeals has found this issue to be immaterial, holding that state law does not alter the Fourth Amendment. *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (quoting *Virginia v. Moore*, 553 U.S. 164, 172 (2008)).

Thus, after de novo review, the Court finds that Judge Roberts did not err in finding that the *Leon* good faith exception applies here even if the warrant at issue is found to lack probable cause. Defendant's objection on this ground is **overruled**.

### E. *Defendant's Statements*

Neither party objects to Judge Roberts' finding that if the search at issue is found to be unconstitutional then defendant's statements should be considered fruit of the poisonous tree or Judge Roberts' finding that defendant was not illegally seized during the search. *See* (Doc. 31, at 15–16); *see also* (Doc. 30, at 23–25, 28–31). As a result, the Court reviews these findings for clear error and finds none. Thus, the Court adopts these sections of Judge Roberts' R&R without modification.

Defendant does object, however, to Judge Roberts' alternative analysis of the attenuation doctrine should the underlying search be deemed unconstitutional. (Doc. 31, at 15–16). Defendant argues Judge Roberts gave too much weight to his assessment that defendant was "remarkably congenial" towards officers while being interviewed and thus his statements were voluntary and sufficiently attenuated from the taint of the search. (*Id.*); *see also* (Doc. 30, at 27–28).

The exclusionary rule is the "principal judicial remedy to deter" law enforcement officers from violating the Fourth Amendment. *Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016). Even if a search is found to be unconstitutional, however, "challenged evidence derived through police illegality will still be admissible under the attenuation doctrine if the causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint." *United States v. Wipf*, 397 F.3d 677, 684 (8th Cir. 2005) (citation and internal quotation marks omitted). In other words, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017). In considering whether statements made as a result of illegal police conduct should be suppressed as tainted, courts consider four factors: (1) whether the defendant was read their *Miranda* rights; (2) the temporal proximity between the constitutional violation and the statements; (3) whether intervening circumstances occurred between the constitutional violation and the statements; and (4) the "purpose and flagrancy of the official misconduct." *United States v. Riesselman*, 646 F.3d 1072, 1080 (8th Cir. 2011) (quoting *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006)).

In his R&R, Judge Roberts found that (1) defendant was read his *Miranda* rights, given additional warnings, and had an amicable prior relationship with Sergeant Ward, (2) defendant's statements appeared to be made while the search was ongoing and

immediately after officers discovered contraband at the residence, (3) no intervening circumstance occurred, and (4) the officers' conduct here was not flagrantly unconstitutional. (Doc. 30, at 26–28). Thus, the first and fourth factors weighed in favor of admitting the statements as attenuated from the search while the second and third factors weighed in favor of a finding that the statements were tainted by the search and must be suppressed. (*Id.*). On balance, Judge Roberts concluded that defendant's statements were attenuated from the search and voluntary largely because he was friendly towards officers, had a prior relationship with Sergeant Ward, and was thoroughly warned that his statements could be used against him. (*Id.*, at 28).

Judge Roberts' characterization of the interview as congenial is entirely accurate. Defendant was alerted that his statements were being recorded, was read his *Miranda* rights, and agreed to talk with the officers. (Gov. Ex. 4 at 00:15–0:1:10). Defendant referred to Sergeant Ward as "buddy" twice. (*Id.* at 00:10–00:15, 07:13–07:18). They chatted about defendant's work, the weather, and other topics in a friendly manner. But, in context, defendant was in handcuffs in a closed bedroom with two officers after the officers had just found marijuana on his person and would likely soon find marijuana elsewhere in the residence if they had not already. (*Id.* at 00:00–00:15, 03:40–04:08). Defendant assured the officers that his only involvement in drugs was using a significant amount of marijuana, that he was not interested in harder drugs, and that he did not sell drugs. (*Id.* at 01:10–3:00, 04:58–05:20). When asked to provide the name of a drug dealer, defendant hesitated before asking "Is this gonna help me out or what?" (*Id.* at 3:10–3:40). Defendant downplayed his use of marijuana, emphasized his role as a father, and seized on opportunities to relate with officers by condemning the criminal behavior of other persons. (*Id.* at 07:53–08:17).

This is a close call. The Court agrees with Judge Roberts' conclusions that the first and fourth factors weigh in favor of attenuation given that defendant was read his

*Miranda* rights, participated in a congenial interview, and no flagrant misconduct by officers occurred. The Court also agrees with Judge Roberts' conclusions that the second and third factors weigh in favor of suppression because of the close temporal proximity between the search and defendant's statements and the lack of intervening circumstances. The Court, however, weighs these factors differently than Judge Roberts and, on balance, finds that they weigh against a finding of attenuation.

The Court finds that the attenuation analysis tips in the other direction because it affords less weight to the fact that the interview was congenial under these circumstances. Defendant's friendly disposition, beyond the fact that perhaps defendant is simply just an affable person, is best understood as his attempt to ingratiate himself with officers in the immediate wake of the search while in custody. By the time of the interview, defendant was in handcuffs and likely knew that lying about contraband in the house or being confrontational would be detrimental to him. Thus, defendant elected to cooperate, relate with the officers, downplay his criminal activity, and stress that he is a father and a hard worker in an apparent attempt to curb his potential criminal liability. In other words, one can catch more flies with honey than vinegar. Importantly, defendant's blarneying was done in direct response to the search. Had the officers instead, for example, just knocked on defendant's door and asked to speak with him, the Court finds it highly unlikely that defendant would have been as obsequious merely out of some friendship with Sergeant Ward or some genial compulsion. Although other courts have given significant weight to the fact that an interview was congenial, those cases involved more attenuated timelines and were less custodial in nature. *Rawlings v. Kentucky*, 448 U.S. 98 (1980) (noting that the congenial atmosphere and free movement of the detainees evidenced that their statements were voluntary even though their illegal detainment had only lasted about 45 minutes); *United States v. Conrad*, 673 F.3d 728 (7th Cir. 2012) (wherein the defendant and officers engaged in friendly banter, but the interview occurred

24

hours after the illegal search at a different location while the defendant was not handcuffed and performing household tasks).

"The giving of *Miranda* warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility." *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994) (citation omitted). Indeed, if that were the case, the attenuation analysis would end at the first prong. Instead, the Court must look to all the factors here to determine whether defendant's statements were sufficiently attenuated from the taint of the search and thus a product of his independent free will. *See United States v. Vega-Rico*, 417 F.3d 976, 979 (8th Cir. 2005). Here, defendant's statements were indeed voluntary in the sense that he was read his *Miranda* rights, waived them, and spoke with officers in the absence of any flagrantly unconstitutional conduct by the officers. The temporal proximity of his statements to the search, the lack of intervening circumstances, and the custodial circumstances of the interview, however, tilt towards a finding that defendant's statements were born out of his immediate reaction to the search as opposed to his independent free will. The sociable nature of the interview, although important, is not enough to mask the direct causal linkage between the search and defendant's statements or purge such statements of unconstitutional taint. *See Riesselman*, 646 F.3d at 1081 (citing *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006) (noting that voluntary consent which occurs "on the heels of" illegal conduct may be insufficient to purge unconstitutional taint).

In sum, the Court finds that the congenial nature of the interview is more so defendant's attempt to curry favor in the wake of the search as opposed to an indication that his statements were the product of his independent free will. In light of this analysis, the Court affords this fact less weight than Judge Roberts and concludes that defendant's statements are not sufficiently attenuated from the search such that they should be admitted even if the search is deemed unconstitutional. Thus, after de novo review, the

Case 1:20-cr-00086-CJW-MAR   Document 39   Filed 03/18/21   Page 25 of 26

Court finds that the attenuation doctrine does not cause defendant's statements to be admissible if the underlying search is deemed unconstitutional and modifies the R&R on this issue. Defendant's objection on this ground is **sustained**.

### F. *Other Uncontested Findings*

Neither party objects to Judge Roberts' findings that defendant's statements need not be suppressed under the Fifth Amendment and that defendant waived any issue regarding statements he made prior to the recorded interview due to his failure to raise this issue earlier. (Doc. 30, at 31–36). As a result, the Court reviews these findings for clear error and finds none. Thus, the Court adopts these sections of Judge Roberts' R&R without modification.

## V. CONCLUSION

For these reasons, the Court **overrules in part** and **sustains in part** defendant's objections (Doc. 31), **adopts in part** and **rejects in part** Judge Roberts' R&R with modification (Doc. 30), **denies** defendant's motion to suppress, and **denies as moot** defendant's motion to dismiss (Doc. 17). The Court modifies Judge Roberts' conclusion on the attenuation doctrine and finds that, if the search at issue is deemed unconstitutional, defendant's statements should be suppressed as fruit of the poisonous tree. The Court also denies as moot defendant's motion to dismiss in light of his subsequent guilty plea. The Court adopts Judge Roberts' R&R in all other respects without modification.

**IT IS SO ORDERED** this 18th day of March, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

26